UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
                                       :
UNITE HERE,                            :
                    Plaintiff,         :
                                       :        06 Civ. 7061 (DLC)
        -v-                            :
                                       :        CORRECTED OPINION
CINTAS CORPORATION,                    :           AND ORDER[1]
                                       :
                    Defendant.         :
                                       :
--------------------------------------X


Appearances:[1]

For Plaintiff:
Anne E. Beaumont
Friedman Kaplan Seiler & Adelman LLP
1633 Broadway, 46th Floor
New York, NY 10019

For Defendant:
Gregory Utter
Keating Muething & Klekamp PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202


DENISE COTE, District Judge:

     Plaintiff Unite Here ("Unite") is a trade union representing

workers in the hospitality, gaming, apparel, textile, retail,

distribution, and laundry industries in North America (Unite

Here, http://www.unitehere.org/about/raynor.asp (last visited

Oct. 2, 2006).  It owns a handful of shares of Cintas Corporation

("Cintas"), a company it is trying to unionize.  Unite has filed

suit under Section 14(a) of the Securities and Exchange Act of

1934, 15 U.S.C. § 78 n(a) ("Section 14(a)"), and Rule 14(a)-9

---

[1] This Opinion corrects the numbering of footnotes.

promulgated thereunder, 17 C.F.R. § 240.14(a)-9 ("Rule 14(a)-9"), claiming that Cintas' recently issued proxy statement contains misleading statements and omissions with respect to material facts in violation of Rule 14(a)-9.  It requests a preliminary injunction compelling Cintas to make corrective disclosures in sufficient time for Cintas' shareholders to receive and consider such information in determining how to cast their votes at Cintas' October 10, 2006 annual meeting.  For the reasons more fully described below, the motion is denied.  The following constitutes this Court's findings of fact based on an evaluation of all the evidence received at the October 4 preliminary injunction hearing, and conclusions of law.

BACKGROUND

     Cintas is a publicly-held company traded on the NASDAQ Global Select Market.  Cintas is the largest uniform supplier in North America, with fourteen manufacturing plants and over 30,000 employees.  Its revenue for the fiscal year ending May 31, 2006 was $3.4 billion.

     The plaintiff owns between five and ten shares of Cintas' approximately 160 million shares of common stock.[2]  Using both legal and illegal means,[3] Unite has engaged since 2004 in a

---

[2] The plaintiff has not presented direct evidence of its ownership of shares, but the fact is not contested by Cintas.

[3] See Pichler v. UNITE, --F.Supp.2d--, 2006 WL 2529688, at *10(E.D. Pa. 2006) (finding that UNITE violated the Driver's Privacy Protection Act of 1994, 18 U.S.C. §§ 2721-2725, by

campaign to force the defendant to institute a card-check procedure so that it can unionize the defendant's workplace without having to engage in an NLRB-supervised secret ballot election.[4]

On September 1, 2006, Cintas distributed to its shareholders notice of its annual meeting to be held on October 10, 2006.  A proxy statement for that meeting solicited shareholder proxies to vote on two matters of relevance here: (a) a proposal by shareholder the Massachusetts Labor Pension Fund ("MLPF

---

accessing the motor vehicle records of Cintas employees for union organizing, a purpose not permitted under Section 2724 of the statute).

[4] In a card-check procedure,

> workers are encouraged to sign cards expressing their desire to be represented by the union and . . . the company agrees to recognize the union when a majority of workers has signed such cards.  When successfully employed, card-check legitimizes recognition of the union without the need for an [NLRB-supervised secret-ballot] election.  In that way, it eliminates much of the cost and risk of an organizing campaign.  More than that, it takes the campaign out of the public view and outside the process anticipated by the National Labor Relations Act.  Elections must be conducted according to certain rules, the violation of which can constitute an unfair labor practice.  In a card-check procedure, these rules do not generally apply.

Testimony of Jarol B. Manheim, Professor of Media and Public Affairs and Political Science, The George Washington University, Hearing Before the Subcomm. on Workforce Protections of the H. Comm. on Educ. and the Workforce, 107th Cong. (Jul. 23, 2002). See Metropolitan Opera Association, Inc., v. Local 100, Hotel Employees and Restaurant Employees International Union, 239 F.3d 172, 174 (2d Cir. 2001)("[a] card check process permits a Union seeking to organize workers to bypass the traditional NLRB election process, and instead to collect cards from individual workers voting in favor of unionization.  When a majority of the workers has checked its cards, the Union can represent the workers.")

Proposal") to amend the company's by-laws to require the appointment of an independent chairman of the company's Board of Directors[5] and (b) the reelection of Cintas' nine current directors, including chairman Richard Farmer and his son, CEO Scott Farmer.

---

[5] The Cintas proxy statement sets forth the MLPF proposal as follows:

> RESOLVED, that pursuant to Section 23.B,10.200 of the Revised Code of Washington, Article TEN of the Restated Articles of Incorporation of Cintas Corporation ("Cintas"), and Article X of the By-Laws, the shareholders of Cintas hereby adopt the following new section 10 of Article III of the By-Laws:

> Section 10. Qualifications of Chairman

> (a) The Chairman of the Board of Directors shall be a Director who is independent from the Corporation. For purposes of this By-Law, "independent" has the meaning set forth in the Nasdaq listing standards. If the Corporation's common stock is listed on the New York Stock Exchange ("NYSE"), the definition of independence set forth in the NYSE's listing standards shall apply. If the Corporation's common stock is not traded on a national exchange, Nasdaq's standards shall apply.

> (b) If the Directors determine that a Chairman who was independent at the time he or she was selected is no longer independent, the Directors shall select a new Chairman who satisfies the requirements of this By-Law within [60] days of such determination.

> (c) This By-Law shall be implemented in a way that does not violate any contractual obligation of the Corporation.

> (d) Compliance with this By-Law shall be excused if no Director who qualifies as independent is elected by the Shareholders or if no Director who is independent is willing to serve as Chairman.

> (e) This By-Law may be amended or repealed only by the Shareholders, Article X of these By-Laws regarding Board amendment of these By-Laws notwithstanding.

Two weeks later, on September 14, plaintiff filed a complaint alleging that Cintas' proxy statement violates Section 14(a) and Rule 14(a)-9 by not adequately disclosing certain corporate transactions concerning Richard and Scott Farmer.  Soon thereafter, on September 18, plaintiff moved for a preliminary injunction compelling Cintas to make corrective disclosures in sufficient time for Cintas' shareholders to receive and consider such information in determining how to cast their votes at Cintas' October 10, 2006 annual meeting.  Absent timely disclosures, plaintiff asked for other relief, including requiring Cintas to reschedule its annual meeting, declaring the proxies solicited by Cintas to be null and void and of no force or effect, and/or invalidating the results of any vote or election conducted with the use of such proxies.

The procedural framework for the hearing on the plaintiff's motion for a preliminary injunction was established at a conference on September 26[6] and is reflected in an Order of September 27.  All direct testimony was taken by affidavit.  In support of its motion for a preliminary injunction, the plaintiff submitted an affidavit from Ahmer Qadeer, Deputy Director in the Strategic Affairs Department of Unite.  Defendant submitted affidavits from Richard L. Roeding, President of Summer Hill, an entity that manages the assets of Cintas chairman Richard Farmer; Wade Gates, Managing Director of Burston Marstellar, a public

---

[6] The parties jointly requested adjournment of an earlier scheduled conference until September 26.

relations firm engaged by Cintas in connection with Unite's attacks against the corporation; and David Custer, Executive Director of the law firm of Keating Muething and Klekamp ("KMK").

In its motion, Unite asserts that Cintas' proxy statement (1) misrepresents the ownership of one Cintas private jet and the benefits accruing to Richard and Scott Farmer from use of the jet, (2) omits description of related party transactions with KMK, and (3) omits a description of related party transactions with the Kentucky Speedway ("Speedway"), which Unite describes as Cintas' "promotional partner."  The hearing on plaintiff's motion for a preliminary injunction took place on October 4, and the motion was denied from the bench with an opinion to follow.  This is that opinion.

<u>The Farmers</u>

Cintas' publicly disclosed information about its relationship with the Farmers includes the following.  Cintas was founded by Richard Farmer.  Richard Farmer is the current chairman of the board of Cintas and has served as chairman of the board of Cintas and its predecessor companies since 1968. Cintas' chief executive officer ("CEO") since 2003 is Richard Farmer's son, Scott Farmer.  He joined Cintas in 1981, and became a director in 1994.  The Farmer family owns over 19 million shares of Cintas common stock, which represents more than ten percent of the outstanding shares.  With the stock trading at approximately $42.10, this represents a value of roughly

$825,391,256.[7]

As Chairman of the Board, Richard Farmer received a salary of $250,000 this year; as CEO, Scott Farmer received a salary of $630,000 this year and a bonus of $236,000.  A five-year graph tracking the performance of Cintas common stock against the S&P 500 stock index and a "peer index" showed that in 2006 Cintas was outperformed by both comparators.  The Cintas Form 10-K for the fiscal year ending May 31, 2006, however, showed an increase over the prior fiscal year in Cintas' revenue, net income, and earnings per share.

Falcon Jet

In 2005, Richard Farmer signed an agreement to buy a Dassault Falcon 900 EX jet (the "Falcon") for approximately $34,000,000.  Cintas decided to buy a share of the Falcon for its own use.  Several entities related to Richard Farmer and several entities related to Cintas agreed that the Farmer entities would pay 75% and the Cintas entities would pay 25% of the purchase price.  Pursuant to a series of written agreements, the Farmer entities also received the right to use the Falcon for 75% of the

---

[7] This estimated value was calculated using the average price per share of Cintas common stock during the quarter ending in May 2006 and the total number of shares owned by the Farmers during this time.  Cintas' 2006 Annual Report indicates that for the quarter ending in May 2006, the price of Cintas stock fluctuated between a high of $44.30 per share and a low of $39.90 per share, resulting in an average price of $42.10 per share.  Cintas' Proxy Statement reports that as of August 18, 2006, Richard Farmer and Scott Farmer owned 19,605,493 shares of Cintas' common stock.

allocated flight hours, while Cintas received the right to use
the Falcon for 25% of the allocated flight hours.  As set forth
in the operating agreement, the Farmer entities in fact paid 75%,
or approximately $26,000,000 of the Falcon's purchase price,
while Cintas paid 25%.  The Aircraft Lease Agreement provides
that Cintas will account for all Falcon-related expenses and bill
the Farmer entities.  Cintas has, to date, billed Delta Wings and
Summer Hill (two entities related to Richard Farmer) for their
respective shares of fixed and variable expenses, and both Delta
Wings and Summer Hill have paid the allocated expenses.

In the proxy statement, Cintas made the following disclosure
with respect to Cintas' interest in the Falcon under the heading
"Certain Relationships and Related Party Transactions":

> Cintas Corporation has a 25% interest in a corporate
> airplane with its Chairman, Richard T. Farmer and his wholly
> owned company.  This arrangement began on February 23, 2006.
> Cintas manages the airplane under an operating agreement
> whereby each party pays their own operating expenses for use
> of the plane, and common costs are shared based on ownership
> percentages.  For fiscal 2006, Cintas was reimbursed
> $340,603 under this arrangement.

The proxy statement discloses that Richard Farmer received
"compensation associated with the use of Cintas' aircraft" in the
amounts of $57,824, $63,536, and $159,475 in fiscal years 2006,
2005, and 2004 respectively.  It also states that in fiscal year
2006 only, Scott Farmer received such compensation in the amount
of $33,608.

The KMK Law Firm

KMK has performed legal services for Cintas for decades. KMK is a limited liability partnership. Robert Coletti is one of forty-six equity partners in the KMK law firm. He is also married to Richard Farmer's daughter Brynne Farmer, and is therefore the son-in-law of Richard Farmer and the brother-in-law of Scott Farmer. Coletti graduated from college in 1979 and is now in his late forties. He was a child when the relationship between Cintas and KMK began in 1959. Coletti receives less than five percent of KMK's income as compensation. The proxy statement does not disclose any transactions between Cintas and KMK, or discuss Robert Coletti.


The Kentucky Speedway

The Speedway is a limited liability corporation that runs a stock car speedway located in Sparta, Kentucky. The Speedway itself consists of a 1.5 mile oval track with 65,000 seats, luxury suites and a restaurant. Cintas is the official uniform supplier at the Speedway. It is undisputed that in fiscal year 2006, Cintas paid $70,000 to the Speedway in connection with sponsorship activities.

Richard Farmer is one of several owners of the Speedway. From June 1, 2005 through May 31, 2006, he owned approximately 4.5% of the Speedway. A Delaware limited partnership ("Partnership") that is largely owned by trusts associated with

9

the Farmer family owns 17.7% of the Speedway.  The proxy
statement does not disclose Richard Farmer's ownership interest
in the Speedway or transactions between Cintas and the Speedway.


DISCUSSION

_____To obtain a preliminary injunction, a plaintiff must
establish: "(1) the likelihood of irreparable injury in the
absence of such an injunction, and (2) either (a) likelihood of
success on the merits or (b) sufficiently serious questions going
to the merits to make them a fair ground for litigation plus a
balance of hardships tipping decidedly" in its favor.  Malletier
v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d
Cir. 2005) (citation omitted).  See also Seaboard World Airlines,
Inc. v. Tiger International, Inc., 600 F.2d 355, 359 (2d Cir.
1979)(applying this standard in litigation brought under Section
14(e) of the Williams Act).[8]

_____The plaintiff asserts claims under Section 14(a) and Rule
14(a)-9.  Section 14(a) prohibits the solicitation of proxies "in
contravention of such rules and regulations as the Commission may
prescribe as necessary or appropriate in the public interest or

_____

[8] When the relief sought will alter rather than maintain the
status quo, the plaintiff must meet a heightened standard which
requires the demonstration of a "clear" or "substantial"
likelihood of success on the merits.  Bronx Household of Faith v.
Bd. of Educ., 331 F.3d 342, 349 (2d Cir. 2003).  Here, both
parties agree that the ordinary standard for a preliminary
injunction applies.  Since Unite does not prevail even under the
lower standard, it is unnecessary to reach the issue of which
standard applies to Unite's motion.

for the protection of investors." 15 U.S.C. § 78 n(a).  A
shareholder may seek redress under Section 14(a) for an issuer's
misleading statements in or omissions from proxy materials
circulated in connection with a matter submitted for shareholder
vote.  United Paperworkers Intern'l Union v. Intern'l Paper Co.,
985 F.2d 1190, 1198 (2d Cir. 1993).

Rule 14(a)-9

     The Securities and Exchange Commission ("SEC") has
promulgated Schedule 14A, Rule 14(a)-101, 17 C.F.R. § 240.14(a)-
101, and Regulation S-K, 17 C.F.R., Part 229 (2006), to implement
Section 14(a).  Rule 14(a)-9 prohibits proxy solicitation "by
means of any proxy statement . . . containing any statement
which, at the time and in the light of the circumstances under
which it is made, is false or misleading with respect to any
material fact, or which omits to state any material fact
necessary in order to make the statements therein not false or
misleading. . . ."  17 C.F.R. § 240.14(a)-9 (emphasis supplied).
See also Schiller v. Tower Semiconductor Ltd., 449 F.3d 286, 290-
91 (2d Cir. 2006).  The SEC promulgated this rule with the goal
of preserving for all shareholders who are entitled to vote, the
right to make decisions based on information that is "not false
or misleading."  United Paperworkers 985 F.2d at 1198.  Section
14(a)'s broad remedial purposes include promotion of the free
exercise of voting rights of stockholders and the protection of
investors.  Id. at 1197-98 (citing Borak, 377 U.S. at 432).

11

There is an implied private right of action under Rule 14(a)-9. Minzer v. Keegan, 218 F.3d 144, 148 (2d Cir. 2000) (citing J.I. Case Co. v. Borak, 377 U.S. 426, 431 (1964)).

An omission of information from a proxy statement is actionable "if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." Seinfeld v. Gray, 404 F.3d 645, 650 (2d Cir. 2005). To show materiality, "the plaintiff must show that there was a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Id. (citation omitted). The "total mix" of information includes only information "reasonably available to the shareholders." Koppel v. 4987 Corp., 167 F.3d 125, 132 (2d Cir. 1999)(citation omitted). A registrant may rely on a "reasonable belief that the other party already has access to the facts [to] excuse him from new disclosures which reasonably appear to be repetitive." Id. (citation omitted). See United Paperworkers, 985 F.2d at 1198. A finding of materiality embodies a showing of a causal relationship between the violation and the injury for which a plaintiff seeks redress if he proves that "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385 (1970).

12

The SEC has issued regulations mandating the disclosure of certain information in proxy statements in order to "communicat[e] meaningful information to security holders in order that they may make informed voting decisions."  Disclosure of Certain Relationships and Transactions Involving Management, SEC Release Nos. 6416, 18878, 33-6416, 34-18878, IC-12543, 25 S.E.C Docket 924, 1982 WL 35926 (Jul. 9, 1982) ["1982 SEC Release"].  The parties refer to three of these regulations: Items 402, 404(a), and 404(b).

Item 402: Compensation of Named Executive Officers and Directors

Item 402 of Regulation S-K sets forth the disclosure requirements with respect to categories of executive and director compensation, including salaries, bonuses, stock option grants, and others.  17 C.F.R. § 229.402.  The purpose of Item 402 is to "provide[] material information regarding the independence of directors."  Executive Compensation and Related Person Disclosure, SEC Release Nos. 8732A, 54302A, 33-8732A, 34-54302A, IC-27444A, available at 2006 WL 2589711, 7 (Sept. 8, 2006) ["2006 SEC Release"].  When the "primary purpose" of a corporate transaction is to provide compensation to executive officers and directors, then these transactions must also be disclosed.  17 C.F.R. § 229.402(a)(2).  Item 402 (a)(2) mandates

> clear, concise and understandable disclosure of all plan and non-plan compensation awarded to, earned by, or paid to the named executive officers designated under paragraph (a)(3) of this item, and directors covered by paragraph (g) of this item by any person for all services rendered in all capacities to the registrant and its subsidiaries, unless

13

otherwise specified in this item.  Except as provided by paragraph (a)(5) of this item, <u>all such compensation shall be reported pursuant to this item</u>, even if also called for by another requirement, <u>including transactions between the registrant and a third party where the primary purpose of the transaction is to furnish compensation to any such named executive officer or director</u>.  No item reported as compensation for one fiscal year need be reported as compensation for a subsequent fiscal year.

<u>Id.</u> (emphasis supplied).

Item 402(a)(3)(i) requires the disclosure of such information with respect to "named executive officers" including "[a]ll individuals serving as the registrant's chief executive officer or acting in a similar capacity during the last completed fiscal year ("CEO"), regardless of compensation level."  17 C.F.R. § 229.402(a)(3)(i).  Item 402(g) requires the disclosure of both "standard" and "other" arrangements for compensation of directors.[9]

_____

[9] Item 402(g)(1)-(2) provides as follows:

> (1) <u>Standard arrangements</u>.  Describe any standard arrangements, stating amounts, pursuant to which directors of the registrant are compensated for any services provided as a director, including any additional amounts payable for committee participation or special assignments.

> (2) <u>Other arrangements</u>.  Describe any other arrangements pursuant to which any director of the registrant was compensated during the registrant's last completed fiscal year for any service provided as director, stating the amount paid and the name of the director.

17 C.F.R. § 229.402(g)(1)-(2).  The instruction to Item 402(g)(2) clarifies that "other arrangements" may include consulting contracts "entered into in consideration of the director's service on the board."  17 C.F.R. § 229.402(g)(2), inst. to Item 402(g)(2).

Item 404(a): Disclosure of "Related Transactions"

Item 404(a) sets forth disclosure requirements with respect to transactions in which certain specified persons connected with a corporation or their relatives have a direct or indirect material interest.  Item 404 is intended to ensure that a company discloses information important to the assessment of "the independence of directors and nominees for director. . . ."  2006 SEC Release at 64.  In promulgating this item, the SEC noted that "[s]uch information is relevant for investment and voting decisions as it indicates insiders' interests in transactions engaged in for the benefit of public security holders."  1982 SEC Release, 25 S.E.C. Docket 924, at 4.

Pursuant to Item 404(a), "related transactions" of over $60,000 must be disclosed in a proxy statement.[10]  17 C.F.R. § 229.404(a) ("Item 404(a)").  SEC regulations define "related transactions" as transactions between a corporation and its executive officers, directors or board nominees, or any members of their "immediate family."  17 C.F.R. § 229.404(a)(1)-(2), (4).  These regulations require disclosure of any such transaction or a series of similar transactions taking place since the beginning of registrant's last fiscal year or "currently proposed," whose value exceeds $60,000 and in which nominees for board or director positions or members of their immediate family "had, or will

---

[10] SEC Regulations which take effect on November 7, 2006 increase the threshold for related transactions to $120,000 in recognition of inflation and "the amount of time that has elapsed since [the threshold] was last set nearly twenty-five years ago." 2006 SEC Release at 67.

have, <u>a direct or indirect material interest</u> . . . . "  17 C.F.R.
§ 229.404(a) (emphasis supplied).  A brief description in the
proxy statement should include "naming such person and indicating
the person's relationship to the registrant, the nature of such
person's interest in the transaction(s), the amount of such
transaction(s) and, where practicable, the amount of such
person's interest in the transaction(s)."  <u>Id.</u>  According to
instruction 2 to Item 404(a), "immediate family members" include
a person's sons-in-law and brothers-in-law.  17 C.F.R. §
229.404(a), inst. 2.  Instruction 1 to Item 404(a) addresses the
materiality of Item 404(a) disclosures and explains that

> the materiality of interest is to be determined <u>on the basis</u>
> <u>of the significance of the information to investors in light</u>
> <u>of all the circumstances of a particular case</u>.  The
> importance of the interest to the person having the
> interest, the relationship of the parties to the transaction
> with each other and the amount involved in the transactions
> are among the factors to be considered in determining the
> significance of the information to investors.

17 C.F.R. § 229.404(a), inst. 1 (emphasis added).

The Instructions to Item 404(a) also set forth certain
exclusions from Item 404(a)'s disclosure requirements.  These
include ten percent participation thresholds where the person
related to the corporate officer or director has less than a ten
percent interest in the entity receiving money from the
corporation.  This exclusion is explicitly made available to only
certain kinds of ownership interests, such as an equity interest
in a corporation or a limited partnership interest in a
partnership.  <u>See</u> 17 C.F.R. § 229.404(a), inst. 6, inst. 8.
Finally, Instruction 9 provides a general exclusion where the

16

interest is not material.  It reads:

> There may be situations where, <u>although these instructions do not expressly authorize nondisclosure, the interest</u> of a person specified in paragraphs (a)(1) through (4) in a particular transaction or series of transactions <u>is not a</u> direct or indirect <u>material interest</u>.  <u>In that case</u>, information regarding <u>such interest</u> and transaction <u>is not required to be disclosed</u> in response to this paragraph.

17 C.F.R. § 229.404(a), inst. 9. (emphasis supplied).

While compliance with Item 404(a) "does not necessarily guarantee that a proxy statement satisfies Rule 14a-9(a), the regulation does provide [courts] with the Commission's expert view of the types of involvement . . . that are most likely to be matters of concern to shareholders in a proxy contest." <u>GAF Corp. v. Heyman</u>, 724 F.2d 727, 739 (2d Cir. 1983) (citation omitted).  Thus, materiality remains a fact specific inquiry that gives due consideration to the SEC's regulations and the guidance these regulations provide to companies engaged in proxy solicitation.

<u>Item 404(b): Disclosure of "Certain Business Transactions"</u>

Item 404(b) requires disclosure of certain current or recent business relationships between business and professional entities when a director or nominee for director also has a relationship with the entity.[11]  Item 404(b)(4) addresses the disclosure of

---

[11] Item 404(b) indicates that proxy statements must disclose the following information regarding these business relationships: "the identity of the entity with which the registrant has such a relationship, the name of the nominee or director affiliated with such entity and the nature of such nominee's or director's affiliation, the relationship between such entity and the registrant and the amount of the business done between the

business relationships between corporations and law firms:

> <u>If the nominee or director is</u>, or during the last fiscal
> year has been, <u>a member of</u>, or of counsel to, <u>a law firm</u>
> <u>that the issuer has retained</u> during the last fiscal year or
> proposes to retain during the current fiscal year; Provided,
> however, that <u>the dollar amount</u> of fee paid to a law firm by
> the registrant <u>need not be disclosed if such amount does not</u>
> <u>exceed five percent of the law firm's gross revenues</u> for
> that firm's last full fiscal year.

17 C.F.R. § 229.404(b)(4) (emphasis supplied).  The SEC recently

adopted a rule that would eliminate Item 404(b) in its current

form and subject qualifying business relationships with law firms

to the disclosure requirements of both Item 402 and Item 404(a)

as of December 15, 2006.  2006 SEC Release at 53.


1) The ownership and use of the Falcon

In its motion for a preliminary injunction, Unite contends

that the proxy statement, in violation of Items 402 and 404(a),

contains misleading disclosures regarding the ownership of the

Falcon and the amount of compensation received by Richard and

Scott Farmer from the Farmer family's use of Cintas' jet

aircraft.  Unite asserted that Cintas owns 100% of the Falcon,

not the 25% reported in the proxy statement, and that the

family's use of a wholly-owned corporate vehicle should have been

disclosed as compensation to Richard and Scott Farmer in excess

of amounts actually disclosed.

Unite has failed to show a likelihood of proving that the

_____

registrant and the entity during the registrant's last full
fiscal year or proposed to be done during the registrant's
current fiscal year." 17 C.F.R. § 229.404(b).

proxy statement contains a misrepresentation regarding Cintas'
ownership interest in the Falcon, or the compensation paid to
either of the Farmers.  Cintas presented evidence that it owns
only the one quarter share reported in the proxy statement.
Unite also failed to show that the compensation figures
associated with the Farmers' use of the jet are incorrect.

As a result, in its reply memorandum, Unite has shifted
gears and now contends that Cintas was required to report in its
proxy statements the monthly rent and operating costs associated
with the maintenance of the Falcon, as well as the precise amount
that Cintas paid to purchase its 25% share of the Falcon.  Unite
has not shown that Cintas paid Richard Farmer any money to
purchase its share of the jet or that any monthly rent
transactions occurred between Cintas and Mr. Farmer.  As far as
the payments between Cintas and Richard Farmer associated with
operating costs, it has not shown a likelihood of proving at
trial that those amounts were not accurately reported in the
proxy sheet.

In sum, the central fact of importance to shareholders --
that Richard Farmer and Cintas jointly own an aircraft -- has
been reported to shareholders in the proxy statement, along with
their proportionate ownership share.  Unite has not shown a
likelihood of success at trial in establishing that there was a
material misrepresentation concerning the aircraft or executive
compensation attributable to personal use of the aircraft on
occasions when Cintas was responsible for the operation of the

aircraft.

2) The law firm of Keating Muething & Klekamp PLL

The plaintiff claims that Cintas' failure to disclose its payments to KMK as related party transactions violates Item 404 (a).  Robert Coletti is an "immediate family" member of board nominees Richard and Scott Farmer, and a partner in KMK.  Cintas has a longstanding relationship with KMK, uses its legal services extensively and presumably has made significant payments to KMK for those services.  On this basis it would appear that the engagement of KMK is a disclosable related party transaction so long as the information is material to investors in connection with this proxy solicitation.

Unite has not shown a likelihood of proving that such payments would be material to shareholders as related party transactions.  As a result, it does not appear that Cintas had a duty to disclose its payments to KMK under Item 404(a).

KMK is a mid-size law firm that has had a long-standing relationship with Cintas since 1959.  There is virtually no likelihood that Unite will be able to show that the relationship with Cintas began because of Coletti's presence at the firm, and little likelihood that it will be able to show that the relationship grew and continued because of that relationship. Unite has argued that the corrective disclosures it seeks are material because they will assist shareholders to assess the integrity of Richard and Scott Farmer.  It is unlikely that Unite

will be able to show at trial that the decision by Cintas to retain the services of KMK is affected in any meaningful way by the presence of Coletti in KMK's partnership ranks.  As described in its Form 10-K, Cintas is a large corporation engaged in extensive litigation.[12]  There is little likelihood in these circumstances that either of the Farmers would choose to rely on a law firm to represent Cintas' interests (and their personal fortunes) based on the family connection described here rather than their evaluation of what would best serve the interests of the corporation.  While it may be prudent (or even mandatory under the revised regulations) for Cintas to make this Item 404(a) disclosure in the future, under Instructions 1 and 9 to Item 404, it does not appear that the size of Cintas' payments to KMK, or Coletti's relationship by marriage to the two Cintas directors and his partnership in KMK, would be significant to shareholders in casting their votes as solicited in this proxy statement.

Because of this conclusion, it is unnecessary to reach the defendant's argument that Item 404(b)(4) governs related party transaction disclosure for law firms.  Item 404(b)(4) addresses disclosures when an attorney is both a director (or nominee) and a member of a law firm retained by the corporation.  In such circumstances, the affiliation must be disclosed, and if the

---

[12] The Form 10-K warns that if certain lawsuits are decided adversely to Cintas, that could result "in liability material to our firm's condition."  The lawsuits include a putative class action for violation of fifteen states' labor laws and a discrimination lawsuit in which the EEOC has intervened.

corporation's payments to the law firm exceed five percent of the firm's gross revenues, then the retention fees must also be disclosed.[13]   17 C.F.R. § 229.404(b)(4).   Cintas contends that no disclosure is required under Item 404(b)(4) since Coletti is not a director or nominee, and in any event, the plaintiff has not shown (and will not be able to show) that Cintas' payments to KMK exceed five percent of the law firm's gross revenues.

It would be anomalous for there to be a requirement under Item 404(a) for Cintas to report its payments to KMK because a KMK partner is a brother-in-law (and son-in-law) of a director, but for there to be a specific exclusion of that disclosure when the KMK partner is the director (assuming the fees fall below the five percent threshold).   Not surprisingly, therefore, the SEC has issued an interpretive statement which requires a director who is a law firm partner to comply with Item 404(b)'s requirements rather than Item 404(a).   The parties argue about the weight to be given to the interpretive statement, but this dispute need not be resolved here.   Since the disclosure is not material to this proxy statement, for the reasons already explained, the relationship need not be disclosed even if Item 404(a) were applicable.   The lines drawn by the SEC in Item 404(b)(4), however, do support this Opinion's conclusion that the relationship is immaterial.

---

[13] Cintas is in error to the extent that it argues that Item 404(b)(4) would excuse all disclosure.  Under 404(b)(4), if Coletti were a director, Cintas' retention of his law firm would have to be disclosed.

3) Richard Farmer's ownership interest in the Kentucky Speedway

The plaintiff's second omission claim is that Cintas had the duty to disclose its financial transactions with the Speedway pursuant to Item 404(a).  In its motion, Unite asserted that Richard Farmer owns 18.5% of the Speedway.  In fact, during the relevant time period, Richard Farmer held less than a 4.5% ownership interest in the Speedway.  Nevertheless, because Cintas paid $70,000 to the Speedway, which exceeds the $60,000 threshold by $10,000, this qualifies as an Item 404(a) related party transaction.

Considering all of the facts related to this transaction, Unite has failed to show a likelihood of proving that this related party transaction would have been material to Cintas' shareholders.  In particular, it has not shown that a reasonable investor would find this transaction of assistance in evaluating Richard Farmer's integrity and qualifications to continue to serve as a director of the corporation.  A payment of $70,000 is negligible in the context of a corporation whose business expenses amount to over $2.8 billion, and is in any event made to an entity which the plaintiff describes as the defendant's "promotional partner."  This conclusion is underscored by the SEC's recent amendment to Item 404(a), which raises the threshold value for related party transactions from $60,000 to $120,000. 2006 SEC Release at 67.  Thus, as of November 7, 2006, corporations will not be required to disclose related party

23

transactions valued at only $70,000, such as the one between Cintas and the Speedway.   Id.

In an effort to cobble together a materiality argument, Unite argues in some (but not all) of its submissions that both Nascar and the Speedway are "promotional partners" with Cintas, that the Speedway has sued Nascar, that the existence of the litigation is injurious to Cintas' interests, and that the litigation constitutes a conflict of interest for Richard Farmer. Unite has not shown, even if it could prove each of the facts necessary to support the chain of inferences that it seeks to draw, that the existence of this litigation would alter the analysis of materiality of the Cintas payment to Speedway.

Finally, at the hearing, Unite introduced for the first time an argument that the Partnership's 17.7% interest in the Speedway should be combined with Richard Farmer's 4.5% ownership interest in evaluating the materiality of the disclosure.  Since the judgment that this payment to the Speedway is immaterial does not hinge on an analysis of the extent of Richard Farmer's stake in the Speedway, it is unnecessary to explore whether the Partnership's interest is properly attributed to Richard Farmer in the context of an Item 404(a) disclosure.

The plaintiff's motion for preliminary injunction must be denied.  Based on the record created on this motion, it appears that the plaintiff had no genuine belief in the merits of its claims, but brought this lawsuit as part of its campaign to harass a corporation and gain leverage in a unionization

24

struggle.  Even if Unite did not file this lawsuit out of its concern for the best interests of Cintas or its shareholders, the court must be sufficiently confident at this stage of the litigation that Cintas shareholders were given all of the material information that they need to cast their votes at this annual meeting, and in particular to assess the independence and integrity of Cintas' directors.  Unite has not shown that any of the disclosures it seeks to have Cintas make would be material to shareholders as they engage in the voting at the October 10 annual meeting.

Conclusion

    The plaintiff's motion for a preliminary injunction is denied.


SO ORDERED:

Dated:    New York, New York
          October 11, 2006

                              _____
                              DENISE COTE
                              United States District Judge